LEON J. BENDLER, PETITIONER-APPELLANT, v. OLGA BENDLER, DOING BUSINESS AS BENDLER EMBROID-ERIES, DEFENDANT-RESPONDENT.

Argued October 3, 1949—Decided November 21, 1949.

*Mr. John A. Laird* argued the cause for appellant (*Mr. David Roskein,* attorney).

*Mr. Roland Vreeland* argued the cause for respondent (*Mr. Gerald T. Foley,* attorney).

The opinion of the court was delivered by

HEHER, J. This cause was certified for appeal by this court, *et mero motu,* to the Appellate Division of the Superior Court, where it was pending on appeal from the Hudson County Court, pursuant to Article VI, section V, paragraph 1 of the Constitution of 1947 and *Rule* 1:5–1 of this court.

The primary question is whether compensation is recoverable under the Workmen's Compensation Act (*R. S.* 34:15–7 *et seq.*) by a husband who was injured while serving his wife, at a stipulated weekly salary, in the operation by her of an

embroidery business separate and apart from him. The issue was resolved in the negative by the Compensation Bureau and the Hudson County Court.

The husband had no proprietary interest in the enterprise; all the property and assets of the business were the sole and separate estate of his wife. It is conceded that the injury was the result of an accident arising out of and in the course of the service. The mishap occurred while the husband was operating an automobile in the pursuit of his work; and the inquiry is as to the existence of the relationship ·between the husband and wife which. is made a *sine qua non* in the definition of the statutory class.

The question is fundamentally one of contractual capacity, for the obligations of the optional or elective compensation provisions comprised in Article II of the Compensation Act are thereby constituted an integral part of the contract of hire between a master and his servant, and so are contractual in nature. "Employer" is declared in Article 3 to be synonymous with master; and "employee" synonymous with servant, "and includes all natural persons who perform service for another for financial consideration, exclusive of casual employments," as therein defined. *R. S.* 34:15–36. In common usage, one cannot be an employee without a contract. Employment ordinarily presupposes a contractual. relation. *In re Humphrey's Case,* 227 *Mass.* 166, 116 *N. E.* 412 (1917). But there is more to render certain the statutory concept. The elective scheme becomes operative only upon its acceptance by mutual "agreement, either express or implied," as therein provided. *R. S.* 34:15–7. Such "agreement" constitutes "an acceptance of all the provisions" of the Article and a surrender by the parties of "their rights to any other method, form or amount of compensation or determination thereof than as" therein provided. *R. S.* 34:15–8. Barring "an express statement in writing" as "a part" of the "contract of hiring * * *, either in the contract itself or by written notice from either· party to the other," that the provisions of Article II are not "intended" to apply, it is "presumed that the parties have accepted the provisions"

of the Article, "and have agreed to be bound thereby." *R. S.* 34:15–9. The "contract for the operation of the provisions" of the Article is terminable by either party upon sixty days' notice in writing "prior to any accident." *R. S.* 34:15–11. The term "hire" has reference to the act of engaging the services of a person for compensation.

Compulsory compensation without regard to fault, in lieu of the common-law liability for negligence, confined to certain gainful occupations denominated "hazardous employments," has been treated as within the reserve police power of the State. The loss of earning power is considered an expense of the common enterprise, just as much so as the repair of broken machinery or other expense falling upon the employer; and the substitute compensatory scheme is sustainable as a reasonable measure grounded in natural justice to serve the general welfare. *New York Central R. R. Co. v. White,* 243 *U. S.* 188, 37 *S. Ct.* 247, 61 *L. Ed.* 667 (1916); *Mountain Timber Co. v. Washington,* 243 *U. S.* 219, 37 *S. Ct.* 264, 61 *L. Ed.* 685 (1917); *Ward & Gow v. Krinsky,* 259 *U. S.* 503, 42 *S. Ct.* 529, 66 *L. Ed.* 1033 (1922); *Madeira Sugar Pine Co. v. Industrial Accident Comm.,* 262 *U. S.* 499, 43 *S. Ct.* 604, 67 *L. Ed.* 1091 (1923).

There can be no doubt that the elective system of compensation provided by Article II is in essence contractual. This is so whether the provisions of that Article be deemed the subject of a true contract grounded in the will of the parties, either express or implied in fact, or an obligation which has its source in the statute irrespective of the will of the parties in the particular case, and so a *quasi* contract or a contract "implied by the law." Unless there be an affirmative rejection of the plan for the alternative common-law liability in *tort* as modified by the provisions of Article I of the Act, either at the outset or later, there is a conclusive presumption that the parties "have accepted the provisions" of the Article and "have agreed to be bound thereby;" and thus by operation of law, if not by the genuine assent of the parties, the provisions of Article II become engrafted into the basic contract of hire and so become a component part of it. It is not indispensable

that there be reality of consent embrace also of the terms of Article II, expressed in words or implied by acts and circumstances; the whole constitutes the contract. But the requisite statutory relationship is non-existent unless it arises from a contract of hire, express or implied in fact. While there may not be a conditional acceptance of Article II, its provisions are in no real sense compulsory; the alternative is Article I, providing compensation for negligence and abolishing the defenses of contributory negligence and assumption of risk in the exercise of the general legislative jurisdiction to grant reliefs and remedies in substitution for those afforded for injuries attributable to the master's fault. *Sexton v. Newark Dist. Telegraph Co.*, 84 *N. J. L.* 85 (*Sup. Ct.* 1913); affirmed, 86 *N. J. L.* 701 (*E. & A.* 1914); *Winfield v. Erie Railroad Co.*, 88 *N. J. L.* 619 (*E. & A.* 1916); *Troth v. Millville Bottle Works*, 89 *N. J. L.* 219 (*E. & A.* 1916); *Steinmetz v. Snead & Co.*, 123 *N. J. L.* 497 (*Sup. Ct.* 1939); affirmed, 124 *N. J. L.* 450 (*E. & A.* 1940); affirmed, 311 *U. S.* 605, 61 *Sup. Ct.* 12, 85 *L. Ed.* 383; *Miller v. National Chair Co.*, 127 *N. J. L.* 414 (*Sup. Ct.* 1941); affirmed, 129 *N. J. L.* 98 (*E. & A.* 1942); *American Radiator Co. v. Rogge*, 86 *N. J. L.* 436 (*Sup. Ct.* 1914); affirmed, 87 *N. J. L.* 314 (*E. & A.* 1915), error dismissed, 245 *U. S.* 630, 38 *Sup. Ct.* 63, 62 *L. Ed.* 520 (1917). It was the province of the Legislature in this manner to regulate contracts of hire and "to determine the incidents of such relationship under the statutory contract or obligation." *Young v. Sterling Leather Works*, 91 *N. J. L.* 289 (*E. & A.* 1917).

Thus it is that the right of compensation under Article II is grounded in a true contract of hire as supplemented by the terms of that enactment. The contract of hire is a basic prerequisite; and unless it comes into being by the mutual assent of the parties, Article II does not become operative. There is in that circumstance no contract to which the terms of the Article can attach as a constituent element. The evident legislative design was the incorporation, in default of adverse action by the parties, of the compensatory system provided by Article II into the common-law contract of hire;

and where, as here, there was no such relationship for want of contractual capacity, these provisions of the Compensation Act have no operative force whatever. It was not intended to alter the essential character of the relationship between master and servant, but rather to substitute, at the will of the parties, a method of compensation for injury without fault in lieu of the common-law rights and liabilities for all employees of the statutory class; and the corollary is that there be a conventional contract of hire, for without it the relation of master and servant does not subsist. The Act had its origin in the general experience that the common-law remedy for negligence did not afford adequate protection for the workmen, and that their welfare and the common interest as well would be served if indemnity for the risks of service, even without fault, should be made to fall upon industry as an incident of the operation and eventually upon the consumer. In a word, the Act provides "social insurance" superimposed upon a real contract of hire. *Young v. Sterling Leather Works, supra.*

But a contract of hire between spouses is utterly void and unenforceable at law. The acts empowering a married woman to bind herself by contract as if a *feme sole,* and to sue and be sued in her own name, apart from her husband, have not so far severed the unity of person and interest of husband and wife in the law as that their contracts *inter se* are enforceable at law and are no longer the subject of jurisdiction in courts of equity alone. The disablement of husband and wife to contract with and to sue each other continues "except as heretofore, and except as authorized" by the provisions of the chapter relating to married persons embodied in the Revision of 1937. *P. L.* 1852, *p.* 407; *Revision of* 1874, *p.* 468, §§ 5, 10, 11, 14; *Revision of* 1877, *p.* 638, §§ 5, 10, 11, 14; *P. L.* 1895, *p.* 821; *Comp. Stat.* 1910, *p.* 3226, §§ 5, 10, 11, 14; *P. L.* 1934, *p.* 490; *R. S.* 37:2–5, 37:2–6, 37:2–16. *Vide Alpaugh v. Wilson,* 52 *N. J. Eq.* 424 (*Ch.* 1894); affirmed, *Ibid.,* 589 (*E. & A.* 1894); *Turner v. Davenport,* 61 *N. J. Eq.* 18 (*Ch.* 1900); reversed on other grounds, 63 *N. J. Eq.* 288 (*E. & A.* 1901).

Yet it is said that contracts of husband and wife *inter se* are enforceable in equity if "shown to be fair;" and that "if enforceable in any forum they are valid rather than void." The acceptance of this view would nullify the express statutory incapacity cited *supra*. Contracts of husband and wife during coverture are void at common law; and they are void under the statute. *Woodruff v. Clark & Apgar*, 42 *N. J. L.* 198 (*Sup. Ct.* 1880); *Thomson v. Taylor*, 66 *N. J. L.* 253 (*E. & A.* 1901). In the former case, Chief Justice Beasley had this to say with respect to the cited disabling statutory provision: "This language is not uncertain, and the provision is perspicuous with respect to its policy. The object was to leave the husband and wife, touching their capacity to bargain together, on the ancient footing of the common law. The clause is virtually a legislative declaration that, as heretofore, they may enter, *inter sese,* into equitable agreements, but not into legal agreements. It was obviously intended that the court of equity should, as it had always done, prior to the amplification of the rights of the wife, exercise a supervision over the engagements of married persons. * * * Contracts of this class do not always rest, in point of validity, on fixed and palpable rules of law; sometimes they approach closely to the field of discretion."

It would seem that on principle a contract void at law for mutual disability is likewise without contractual force in equity, for otherwise the legislative policy could be set at naught by the exercise of the equitable function. It is not the province of equity to invade this fundamental policy of the law. The essential elements of a contract are the same in equity and at law. In general, the same rules prevail in both jurisdictions as to parties and their capacity to contract, as to consideration, and as to the assent or *aggregatio mentium*. Yet equity interposes in certain circumstances to prevent an unconscionable advantage by one party over the other; and it will enforce postnuptial agreements between husband and wife which are in the particular circumstances deemed binding in conscience. *Pomeroy's Equity Jurisprudence* (5th *Ed.*), § 1293. It recognizes equitable contracts by represen-

tations and acts, irrespective of a common intention to be bound. It takes cognizance of special rights grounded in conscience which are not noticed at law. *Ibid.*, §§ 1294, 1295. And it is the rule that, while a married woman is incapable of binding herself personally in equity to the same extent as at law, her contracts relating to or made in view of her separate estate are so far valid and effectual as to be enforceable against her separate estate. Equity has never clothed married women with the capacity to bind themselves personally by contract. Their contracts, when void at law, are deemed in equity contracts *sub modo* only. The liability in such cases is not legal, but equitable only, enforceable against the wife's separate estate according to the dictates of equity and good conscience. The true rationale of the doctrine is that "the liability of a wife's separate property for her engagements is a mere equitable incident of her separate estate, which is itself a creature of equity." *Wood v. Chetwood*, 44 *N. J. Eq.* 64 (*Ch.* 1888); affirmed, 45 *N. J. Eq.* 369 (*E. & A.* 1889); *Healey v. Healey*, 48 *N. J. Eq.* 239 (*Ch.* 1891); *Demarest v. Terhune*, 62 *N. J. Eq.* 663 (*Ch.* 1901); *Woodruff v. Clark & Apgar, supra; Pomeroy's Equity Jurisprudence* (*5th Ed.*), §§ 1121, 1122, *et seq.*, 1293. The correlative equitable rights and duties which arise out of the transaction constitute the subject of equitable cognizance. *Ireland v. Ireland*, 43 *N. J. Eq.* 311 (*Ch.* 1888); *Garwood v. Garwood*, 56 *N. J. Eq.* 265 (*Ch.* 1897); *Adoue v. Spencer*, 62 *N. J. Eq.* 782 (*E. & A.* 1901); *Lister v. Lister*, 86 *N. J. Eq.* 30 (*Ch.* 1916); *Fike v. Fike*, 3 *N. J. Misc.* 485 (1925); affirmed, 99 *N. J. Eq.* 424 (*E. & A.* 1926). The reason of the rule was thus stated by Lord Justice James in *Jones v. Grissell, L. R.* 12, *Ch. Div.* 484 (1879): "In equity the liability is to have her separate estate taken from her for the benefit of a person with whom she had contracted on the faith of it. That was a special equitable remedy arising out of a special equitable right." And in *Owens v. Dickenson, Craig & Ph.* 48, 53, Lord Cottenham said that "the separate property of a married woman being a creature of equity, it follows that, if she has a power to deal with it, she has the

other power incident to property in general; namely, the power of contracting debts to be paid out of it; and inasmuch as her creditors have not the means at law of compelling payment of those debts, a court of equity takes upon itself to give effect to them, not as personal liabilities, but by laying hold of the separate property as the only means by which they can be satisfied." See, also, *Sims v. Ricketts, 35 Ind.* 181 (1871).

But we have no occasion to pursue the inquiry. The principle thus invoked does not serve the husband here. Article II of the Compensation Act is not applicable where the relationship of master and servant does not subsist; and there is no such relation where the purported contract of hire is void at law. The Workmen's Compensation Bureau has no equitable jurisdiction. Indeed, this court has lately held that the Bureau is a mere administrative agency within the Executive Department of the State, and not a judicial tribunal. *Mulhearn v. Federal Shipbuilding & Dry Dock Co.,* 2 *N. J.* 356 (1949). And chancery has no jurisdiction to enforce the provisions of the Compensation Act. Plainly, that was not within the legislative concept. These compensatory provisions are on well-settled principles enforceable only as ordained by the statute.

The opinion *contra* proceeds on the hypothesis that the Constitution of 1947 effected a merger of law and equity functions and that, by invoking the supposed rule that a contract between spouses is cognizable and enforceable in equity as written, if there be a consideration to support it, the legislative invalidation of such undertakings may be rendered wholly nugatory. The statement of the proposition carries its own refutation. The judicial authority may not thus usurp the legislative province. The wisdom of the policy is within the exclusive domain of the lawmaking body. The Constitution of 1947 has not altered the substance of equity. Its content and quality remain the same; it is the mode of administration that has been reconstituted.

The policy of the law as declared by the Legislature would not be served by a rule that would make a wife

answerable to her husband for compensation for an injury sustained by accident arising out of his service to her, even though rendered in a business conducted by her separate and apart from him. There is no ground whatever for supposing that, by *R. S.* 37:2–5, the Legislature intended to provide for the enforcement of contracts of spouses *inter se* by equitable remedies only, without the medium of a trial by jury. Contracts between husband and wife have been deemed objectionable, not only because they are inconsistent with the common-law doctrine of unity of person and interest, "but because they introduce the disturbing influence of bargain and sale into the marriage relation, and induce a separation rather than a unity of interests." *Wilder v. Brooks,* 10 *Minn.* 50. The integrity of the marriage relation is of primary concern to society. That is the principle of the statutory provision that continues the common-law mutual disability of a husband and wife to contract *inter se* and to sue each other. *Thompson v. Taylor, supra.* The removal of the disability of spouses to enter into a co-partnership *inter se* was accomplished by the exercise of the legislative power. *R. S.* 37:2–16.1. And in so doing, the Legislature carefully limited the scope of the enabling provision. Contractual capacity involves substantive law within the exclusive competency of the legislative authority, rather than a mere rule of evidence subject to judicial control. Lest we forget, the legislative function is distinct from the judicial function, and neither branch may exercise the power granted to the other. *Constitution of 1947, Article III, paragraph* 1. "The judicial power involves the application of the law to concrete facts and, therefore, the investigation and establishment of the facts." *Wigmore on Evidence (3rd Ed.),* § 7.

It is no answer to say that the statute makes insurance coverage compulsory. The legislative command may not be observed; and the insurance carrier may become insolvent. The employer's liability for compensation is primary. *R. S.* 34:15–82, 34:15–86. *Vide Brown v. Conover,* 116 *N. J. L.* 184 *(Sup. Ct.* 1936).

And the inclusion of the husband's name on the payroll, and the acceptance of premiums calculated on the assumption that he was within the coverage of the Compensation Act, did not give rise to an estoppel *in pais*. Without necessarily implying that it is a decisive circumstance, the payroll did not disclose the relationship of husband and wife; and there is no suggestion that the insurance carrier had knowledge of the fact. The elements of estoppel are wanting. Estoppel arises only from words or conduct which have induced a harmful change of position and were reasonably likely to have produced that result. *New Jersey Suburban Water Co. v. Harrison,* 122 *N. J. L.* 189 (*E. & A.* 1939).

Judgment affirmed.

ACKERSON, Justice (dissenting). With due deference, I cannot agree with the judgment of the majority of my brethren in denying workmen's compensation to a husband for injuries received from an accident arising out of and in the course of his employment by his wife in a business owned and operated by her. I feel that we must recognize the realities of present day life with respect to the economic as well as the marital relationship of husband and wife, and that a full analysis of our statute law and judicial decisions leads to a different conclusion than that reached in the majority opinion.

Modern society has progressed a long way since the days when the courts enforced the doctrine that husband and wife were one and that one the husband. As Blackstone puts it, "By marriage the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband * * *." 1 *Blackstone's Commentaries,* 442. Even the early common law was inconsistent in respecting the fiction of marital unity; it gave the husband the right to chastize his wife with a rod no thicker than his thumb. *Ibid.* 444–445, a dubious right that has long since disappeared in the course of the emanci-

pation of married women in almost every state and in almost every respect. The change in the status of women is shown by the fact that in 1910 there were 8,075,000 gainfully employed as against 16,944,000 in 1947, of which number 689,000 were business proprietors, executives, officers and managers. Although completely accurate figures are not available, it appears that of the total number of women employed approximately one-third are married. This change in the position of married women has come about in part by statutes but in equally large measure by judicial decisions. In *Funk v. United States,* 290 *U. S.* 371, 54 *S. Ct.* 212, 78 *L. Ed.* 369 (1933), the United States Supreme Court, in sweeping away the ancient rule that precluded a wife from testifying in behalf of her husband in a criminal proceeding, described the process of the growth of the common law, particularly in this field, to meet new social conditions:

"To concede this capacity for growth and change in the common law * * * and at the same time to say that the courts * * * are forever bound to perpetuate such of its rules as, by every reasonable test, are found to be neither wise nor just, because we have once adopted them as suited to our situation and institutions at a particular time, is to deny to the common law in the place of its adoption a 'flexibility and capacity for growth and adoption' which was 'the peculiar boast and excellence' of the system in the place of its origin."

I.

By a series of statutes New Jersey, in common with almost every other state, beginning as early as 1852, has abolished, one by one, the restrictions which the common law imposed upon the power of married women to act as individuals. Without attempting to trace the course of this movement historically, it is sufficient to refer to the powers now conferred on a married woman by statute: she may act as executrix, administratrix, guardian or trustee, *R. S.* 37:2–1; she may make a will, *R. S.* 37:2–2; her antenuptial contracts with her husband are not affected by her marriage, *R. S.* 37:2–4; she may sue or be sued without joining her husband, *R. S.*

37:2–6; she is solely responsible for her torts, *R. S.* 37:2–8; she may bring an action in tort without joining her husband, *R. S.* 37:2–9; she is solely responsible for debts contracted by her in her own name either before or after marriage, *R. S.* 37:2–10; she may hold the real and personal property owned at the time of her marriage, or which she receives after her marriage, as her separate property, *R. S.* 37:2–12; she is entitled to her wages and earnings and all investments thereof shall be her separate property, "all work and labor performed by a married woman * * * shall, unless there is a separate agreement on her part to the contrary, be deemed to be performed on her separate account," *R. S.* 37:2–13; her separate property is not subject to disposal by her husband or liable for his debts, *R. S.* 37:2–15; she has the right to contract generally "in the same manner and to the same extent as though she were unmarried, which contract shall be legal and obligatory, and may be enforced, in law or in equity," *R. S.* 37:2–16, and to convey her real estate to third persons, *R. S.* 37:2–17, as well as to her husband, *R. S.* 37:2–18, and she "may contract with her husband alone or with her husband and any other person or persons for the formation of a partnership, a limited partnership, or a partnership association * * * and may enter into contracts as such partner * * * as though she were unmarried and any such contract shall be legal and obligatory and may be enforced at law or in equity by or against any such married woman as though she were unmarried." *R. S.* 37:2–16.1.

The majority opinion is predicated on *R. S.* 37:2–5, which provides, *inter alia,* as follows:

"Nothing in this chapter contained shall enable a husband or wife to contract with or sue each other, except as heretofore, and except as authorized by this chapter." *Rev.* 1874, *pp.* 468, 471–472.

This provision first appeared in our statute law in 1874. At that time the right of a married woman to sue in equity on her contracts was well established, as I shall subsequently develop in an analysis of our decisions. The wisdom of the Legislature in limiting suits by husband or wife against each

other on contract to the equitable forum cannot be questioned either as of the date when the statute was passed or now. Recognizing that contracts between husband and wife must be respected and that occasional suits to enforce them must be brought, the Legislature, by restricting such suits to the Court of Chancery, at one and the same time obviated the necessity of trial by jury and its occasional extravagances, and subjected such contracts between husband and wife to the same equitable principles that control all contracts sought to be enforced in equity. The equitable doctrines that apply to suits for specific performance, or for reformation of contracts or to any of the other heads of equity jurisdiction over contracts, are thus by the provisions of the statute made applicable to suits on contract between husband and wife. Cases bearing on this point will be discussed in a subsequent part of this opinion.

For the first time since the adoption of the new Constitution, by which the courts of law and equity were merged in the Superior Court, we are confronted with the fundamental question of which rule we shall follow when there is a conflict between the common law and equity, especially where the conflict is between a strict rule of the common law coming down from medieval times and a liberal rule of equity that comports with modern conditions. The Workmen's Compensation Act was intended as a remedial measure to overcome the strict rules of the common law in the relation of employer and employee. Thus we have to face this fundamental question in a two-fold aspect. Speaking generally, where there is a conflict between a rule of law and a rule of equity as here, which shall prevail? Obviously it must be the rule of equity, for otherwise we should be wiping out the equitable principle involved in the specific case. Equity always either modifies or supplements the common law; to refuse to recognize such a modification or supplement of equity is to reverse the course of the law. This reasoning is particularly applicable to a situation where, as here, the intent of the statute is remedial and liberal and the applicable rule of equity is likewise liberal, expanding and, in fact, overriding, as it does,

with respect to the contracts of married women, the rules of the common law.

But if there were any doubts, which I do not feel, with respect to the intention of the Legislature with reference to *R. S.* 37:2–5, they are completely resolved by the language of the Workmen's Compensation Act itself in defining its terms (*R. S.* 34:15–36):

"'Employer' is declared to be synonymous with master, and includes natural persons, partnerships, and corporations; 'employee' is synonymous with servant, and includes all natural persons who perform service for another for financial consideration * * *."

An employer, as defined in the statute, comprehends all women, including married women who employ their husbands. Employee by definition includes all men, not excepting married men who are employed by their wives. These definitions were first enacted in 1911 in the original workmen's compensation statute and although the section has been amended many times, these definitions still stand. *R. S.* 37:2–5 was on the statute book for thirty-six years before these definitions were adopted. It was on the statute book every time this section was amended. *P. L.* 1913, *c.* 174, *p.* 311; *P. L.* 1919, *c.* 93, *p.* 211; *P. L.* 1931, *c.* 279, *p.* 705; *P. L.* 1932, *c.* 64, *p.* 111; *P. L.* 1945, *c.* 74, *p.* 391. On each occasion when the Legislature amended this section, it must have been aware of *R. S.* 37:2–5 and of the right of husband and wife to sue each other in equity on contracts made with each other. Because of the plain force of *R. S.* 34:15–36, hereinabove quoted, the decision below should be reversed. To ignore it is to struggle to maintain a harsh doctrine of the common law at a time when many married women quite regularly make contracts with their husbands.

The majority opinion, it seems to me, does not give due weight to the foregoing definitions, but proceeds upon the assumption that the husband's right to recover is predicated on Article II of the Workmen's Compensation Act, *R. S.* 34:15–7 *et seq.*, which provides for elective compensation as distinguished from Article I, *R. S.* 34:15–1, which pre-

scribes his right to recover at common law, with the fellow servant rule and the doctrine of the assumption of risk abolished as defenses available to the employer, *R. S.* 34:15-2. It is said that elective compensation presupposes capacity to contract. It is true that the Workmen's Compensation Act does go through the form of either leaving one to a common-law action under Article I or elective compensation under Article II as a means of avoiding what was thought in 1911 would otherwise have been an unconstitutional enactment, but the choice was an illusory one, for the harsh terms, from the employer's standpoint, of *R. S.* 34:15-2 drove everyone to the use of Article II. Since Article II provides:

"When employer and employee shall by contract, either express or implied * * * accept the provisions of this article compensation for personal injuries to, or for the death, of each employee by accident arising out of or in the course of his employment, shall be made by the employer without regard to the negligence of the employer." *R. S.* 34:15-7,

and when *R. S.* 34:15-36 defines the terms "employer" and "employee" as hereinbefore stated, how can it be said that it was denying them capacity to contract? And how can it be said that any question of capacity to contract was to be judged exclusively by rights granted or denied at law, when there were adequate remedies available to husband and wife in equity?

The majority opinion asserts that on principle a contract void at law for mutual disability is likewise without con-tractual force in equity, and it thus becomes necessary to examine the decisions in this State on that point.

## II.

Antedating *R. S.* 37:2-5 first enacted in 1874 and un-doubtedly in the minds of the Legislature at that time, is the case of *Perkins v. Elliott*, 23 *N. J. Eq.* 526 (*E. & A.* 1872), where Chief Justice Beasley, speaking for the entire Court of Errors and Appeals, traced the development in equity of the right of a married woman to hold property and to con-

tract despite the restrictive doctrines of the common law flowing from the fiction of marital unity (23 *N. J. Eq.* 526, 528–530, 534–35):

"*  *  * Looking back to the beginning of this system, we find that the separate estate itself of the *feme covert* is a pure creature of equity. It bears no analogy to anything existing in the common law. According to the general legal doctrine, the effect of marriage was to merge the existence of the wife into the legal life of the husband, so that with respect to property and civil rights, she, as a separate person, had no recognition. In open derogation, of this cardinal principle, equity chose to invest her with a capacity to hold property in her individual right. It is certainly not to be wondered at that an estate thus originating in this clear violation of the laws of property as between husband and wife, should have been afterwards modified to suit the supposed convenience or exigency of the case.

"Nor did equity scruple to introduce another anomaly when the occasion seemed to require it. It having been settled that the wife might enjoy a separate estate, the result was, as the laws of property attached to it, that she could alienate it, and this power, in its application to settlements, proving disadvantageous, the defect was remedied by another violation of legal rules, and a restraint against alienation inconsistent with the nature of the estate granted, was supported. The structure raised on a foundation thus arbitrarily laid, could of necessity have no other form than that which would proceed from the will of the builders. And such in truth was the result.

"The married woman being thus recognized as the owner of the estate, the question arose as to the nature and extent of her authority over it. It became obvious at once, that in order to enjoy the privilege thus granted she must be allowed to make contracts with respect to her separate interests, and it was accordingly soon intimated in *Grigby v. Cox*, 1 *Ves., sen.*, 517, and in *Peacock v. Monk*, 2 *Ves., sen.*, 190, that to this extent she would be regarded in equity as a *feme sole*. The result was that those contracts which a woman under coverture made touching her separate property, although void at law, were universally enforced in equity, the principle at first being that such contracts, operating on the property, were in the nature of the execution of a power of appointment. But it was soon supposed that this principle was not broad enough to satisfy the purposes to be subserved, and accordingly in the great case of *Hulme v. Tenant*, 1 *Bro. C. C.* 16, Lord Thurlow decided that a bond of a *feme covert*, jointly with her husband, would bind her separate property. His language is: 'I have no doubt about this principle, that if a court of equity says a *feme covert* may have a separate estate, the court will bind her to the whole extent as to making that estate liable to her own engagements, as, for instance, for the payment of debts, &c.' This case does not appear to have been entirely satisfactory to Lord Eldon, but

he never judicially departed from it, and it has been followed in many subsequent· cases, and, according to Lord Cottenham, it contains the correct view of the principle upon which equity acts in giving effect to the agreements of married women. *Owens v. Dickinson*, 1 *Cr. & Ph.* 54.

"This principle, that the general engagements of a *feme covert* will be effectuated by the method of the court acting on her separate property, has, in a long series of cases, been applied and put in force. Thus it has been held that she can render her estate liable in the form of an acceptance of a promissory note, or her own note, or on an engagement to pay an additional rent for a house, or on her promise to pay the costs and proceedings of a suit in chancery." (*pp.* 528–530.)

\*   \*   \*   \*   \*   \*   \*

"\*   \*   \* In testing the wife's right to act as a *feme sole*, the only question is whether she is to derive any benefit from the transaction, for if such benefit is to accrue, her right to bind herself is unquestionable. In the absence of fraud or imposition, this court cannot attempt to measure the adequacy of the interest which has induced her action. Whenever her property or rights are involved she has a competency to contract, and consequently must decide for herself as to the value of that which she will acquire by an outlay of her money, or as an equivalent for her engagements. The rule, of necessity, must be universal, that in all cases where the act of the *feme* ensues directly to her own benefit, and she, expressly or by implication, binds her estate, a court of equity will enforce such obligation." (*pp.* 534-535.)

In *Woodruff v. Clark & Apgar*, 42 *N. J. L.* 198 (*Sup. Ct.* 1880), cited in the opinion of the majority of the court, a wife to whom her husband had executed a chattel mortgage was not allowed to replevy the chattels which had never been in her possession, but Chief Justice Beasley, speaking for the court, stated:

"That this transfer was enforceable in equity, and that the title of the plaintiff would have been protected in that *forum* against the claims of her husband's creditors, no one will deny, the only question being, whether such transfer can be recognized and effectuated by a court of law." (*p.* 199.)

*Wood v. Chetwood*, 44 *N. J. Eq.* 64 (*Ch.* 1888); affirmed, *per curiam*, 45 *N. J. Eq.* 369 (*E. & A.* 1889), likewise cited by the majority of the court in its opinion, enforced the note of a deceased husband to his wife, Vice-Chancellor Van Fleet holding:

"Courts of equity alone can give a remedy on a contract made between a husband and his wife, whether redress is sought by one of the original parties against the other, or by or against the legal representative of one or both of the original parties." (p. 66.)

*Healey v. Healey,* 48 *N. J. Eq.* 239 (*Ch.* 1891), also cited by the majority of the court in its opinion, was an action by a husband seeking to recover from his wife money he allegedly loaned her to pay a certain indebtedness due on her property. Upon a finding that the husband did advance the money under an agreement by the wife to reimburse him, judgment for such amount was given, the court stating:

"An agreement by a married woman, owning a separate estate, made with her husband, to reimburse him from such estate for moneys loaned her, or paid by him for the benefit of her estate, on the faith of such agreement and at her request, will be enforced, in equity, against her separate estate." (p. 240.)

Neither the holding nor the language of the case would seem to support the majority opinion in the case at bar.

In *Taylor v. Wands,* 55 *N. J. Eq.* 491 (*E. & A.* 1897), a married woman, after her husband's business failure, cashed in a policy of insurance on her husband's life and used the money to start a new business corporation. This transaction was considered *bona fide* and the shares were not held liable for the husband's debts. The lower court's decree subjected to the judgment of the husband's creditors the accumulated earnings of the company, the husband having worked for his wife's company and accumulated large earnings therefor. This decree was reversed on the ground that the husband-employee had no right to such accumulated earnings, he having received a salary for his services, the court stating:

"Under our Married Woman's act and the deliverances of our courts on the subject it is thoroughly settled that a married woman may embark her own money and capital in any separate business or trade; may make valid contracts respecting the same; may employ agents in carrying on such business or trade, and may avail herself of their skill and ability to make it successful. She may employ her husband as such an agent, and make use of his business ability, experience and energy to the same purpose. Earnings upon or increase

of her capital in such business or trade, though due in part to the services rendered by her husband, will still belong to her and will not be liable to be seized by the husband's creditors as his property."

*Garwood v. Garwood*, 56 *N. J. Eq.* 265 (*Ch.* 1897), cited by the majority of the court in its opinion, was an action by a wife to foreclose a chattel mortgage given to her by her husband. The validity of the mortgage was contested by a subsequent judgment creditor of the husband. The court, upholding the wife's rights, stated:

"The moment that the separate existence of the wife was admitted, it followed that the impossibility of recognizing any contractual relations between them at once disappeared. Therefore, courts of equity have never refused to enforce such contracts merely because of any difficulty springing from the common-law doctrine of the unity of husband and wife. The courts do not enforce all contracts between husband and wife, because the power is an equitable one and and to be used for the best interests of all the parties, including their interest as husband and wife." (*p.* 266.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"A chattel mortgage is a conditional sale. The consideration of this mortgage being admittedly money loaned, the wife's title under it is, in this court, unimpeachable." (*p.* 267.)

*Fike v. Fike*, 3 *N. J. Misc.* 485 (*Ch.* 1925); affirmed, *per curiam*, 99 *N. J. Eq.* 424 (*E. & A.* 1926), cited by the majority of the court in its opinion, was a bill for specific performance of a husband's written promise to his wife to assign certain stock and deliver a specified make automobile in consideration of her releasing a right of dower by executing a deed of conveyance to a house standing in the husband's name. Notwithstanding the wife's performance the husband refused to perform. Having found there was nothing unfair in the agreement, damages for breach of contract were awarded the wife, although husband and wife were living together.

None of the foregoing cases are authority for the position contended for in the majority opinion, nor are certain other cited cases actual authority when one looks beyond the language of the decision to what the court actually did. *Demarest v. Terhune*, 62 *N. J. Eq.* 663 (*Ch.* 1901), was an action by a husband's executors on a promissory note given by the wife

to the husband in consideration of his joining in a deed of her property and releasing his estate by curtesy in the land conveyed. The court held that there was consideration for the note, stating:

"\* \* \* where the husband sues the wife in equity on her promissory note given for money borrowed, or goods sold and delivered by the husband to her, or for other contributions made by him to her separate estate at her request, the equitable action does not necessarily involve the enforcement of the contract according to its terms. It is a contract *sub modo* which is brought into court—a contract which may be largely or wholly enforced, absolutely or upon terms as the court may deem equitable. In fact, this class of actions in equity, brought by the husband against the wife, although they may present contracts of the most solemn nature, which, at law, would absolutely control the rights of the parties, are, in their essential nature, demands for compensation upon an equitable *quantum meruit.*" (*pp.* 671–672.)

What is a contract *sub modo?* It is defined, if indeed such vagueness is susceptible of definition, as "subject to a modification or qualification; after a fashion, in some manner," Ballentine Law Dictionary; "under a qualification, subject to a restriction or condition," Black Law Dictionary; "under a qualification—a legacy may be given *sub modo,* that is subject to a condition or qualification," Bouvier Law Dictionary. I have never seen any suggestion that it is a contract lacking in the essential elements of offer and acceptance and valid consideration. There are many contracts where there are offer and acceptance and valid consideration, apart from contracts between husband and wife, that are not always enforceable in equity though suit might be brought on them at common law. The various equitable defenses which might be asserted in a suit for specific performance to a legally enforceable contract at law render such contracts equally *sub modo* with contracts between husband and wife. Contract *sub modo,* whatever the phrase may mean, is not one which is exclusively applicable to contracts between husband and wife. It might also, with equal clarity, be applied to those contracts at law where offer, acceptance and consideration exist, but which are not always enforced in the courts of law because of some

positive prohibition of statute or some rule of public policy. In short, the phrase *sub modo* is so vague as to be meaningless. The important thing to note is that the contract in the *Demarest* case was enforceable in equity no matter what appellation the learned Vice-Chancellor may have used to characterize it. Similarly, *Ireland v. Ireland,* 43 *N. J. Eq.* 311 (*Ch.* 1888), which is likewise cited by the majority, was an action by a wife for dower in which was interposed a separation agreement recognizing the husband's rights to all his property. The court ruled that the separation agreement did not bar the wife's dower since it did not show she understandingly yielded such right or that she did so for adequate consideration. The decision may be explained as resulting from the fact that dower as such was not mentioned in the agreement. The court also emphasized weighing the equities of the agreement and, having found no consideration for the yielding of dower, refused to accept the separation agreement as a bar to dower. *Adoue v. Spencer,* 62 *N. J. Eq.* 782 (*E. & A.* 1901), cited by the majority, merely holds that a deed given by a husband to his wife through a third party was treated as a mortgage for any indebtedness due her from her husband, and does not hold that husband and wife may not contract and have their contract enforceable in equity. *Lister v. Lister,* 86 *N. J. Eq.* 30 (*Ch.* 1916), also cited by the majority, involved a husband who obtained a Nevada divorce which the court refused to recognize. In addition, a paper releasing the wife's claims in the suit for $400 was held not to be a valid discharge of his duty to his wife or a contract which equity would recognize because unfair and oppressive. The same holding undoubtedly would have resulted in equity on a suit for specific performance of a similar contract, had hardship been asserted as a defense.

## III.

In summary, contracts between husband and wife, while not the subject of suits at law, have never been treated as null and void in this State, despite occasional language to

that effect. When such language occurs it is traceable to early common law cases based on common law doctrines as to the unity of husband and wife that are no longer accepted either by reason of statutes controlling the situation or because of doctrines that have developed in equity. In equity contracts between husband and wife have long been enforced according to their terms, unless an equitable defense was interposed such as would have been available in any suit in equity. Thus, equity has enforced a promissory note given by a husband to a wife (*Alpaugh v. Wilson*, 52 *N. J. Eq.* 424 (1894) ; affirmed, *Id.*, 589), has given a husband judgment for amounts loaned to his wife on her promise to repay (the *Healey* case, *supra*, 48 *N. J. Eq.* 239), a wife has been allowed to foreclose a chattel mortgage given to her by her husband (the *Garwood* case, *supra*, 56 *N. J. Eq.* 265), a wife has been given damages for breach of an agreement by her husband (the *Fike* case, *supra*, 3 *N. J. Misc.* 485; affirmed, *per curiam*, 99 *N. J. Eq.* 424), a husband has been allowed to recover on a promissory note given by the wife (the *Demarest* case, *supra*, 62 *N. J. Eq.* 663), a wife's separate property has been held not liable for her husband's debts, although her husband was employed by her in that business (the *Taylor* case, *supra*, 55 *N. J. Eq.* 491), and a married woman has been allowed to recover for services rendered a firm of which her husband was a member, *Turner v. Davenport*, 63 *N. J. Eq.* 288 (*E. & A.* 1901).

Thus, it clearly appears that contracts between husband and wife that are not protected at common law are protected in equity. Since in equity a wife's right to her earnings from a firm of which her husband was a member was recognized, as well as a wife's right to employ her husband in her separate business and pay him wages, it would seem that the husband is also entitled to a comparable protection and if employed by his wife in her separate business he should have a right to obtain wages for services rendered. Moreover, a husband's right to wages and earnings stands on a different footing from that of the wife. He has always had unrestrained power to contract and render service and compensation therefor was his absolute right, while at common law the wife's wages

belonged to the husband. Today, when women as well as men are employed and have a right to their own wages, and women are conducting business of all sorts, can it be argued that common law disabilities ought to apply and limit the rights of married couples to contract?

It is pertinent to refer again to the statute by which married couples are accorded the right to contract as partners, *R. S.* 37:2–16.1. If husbands and wives may contract to form business partnerships and such contracts are in the words of the statute "legal and obligatory," can it be argued that a contract to employ one's husband in a wife's business is any less so? Is a wife to be denied the right to employ her husband at a salary, and is he to be denied the right to work for her for remuneration, when they are allowed to carry on a business as partners? A result whereby any other employee, except a husband employed by his wife or a wife employed by her husband, may recover workmen's compensation in the event of a compensable accident, and they alone in such relationship may not, even though they might have been permitted to be partners, is a result which is unsound and illogical.

Both the statutes of the State and the course of decisions in equity dictate that the petitioner should be allowed to recover, unless we are prepared to hold that some of the liberal principles of equity are to be ignored in the process of blending the administration of law and equity under the new Constitution. That, I cannot believe was the intention of the framers of the Constitution, nor do I think that it comports with modern conditions of life and business. I would therefore reverse the judgment below.

I am authorized by the Chief Justice to say that he concurs in the views herein expressed.

*For affirmance*—Justices CASE, HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*For reversal*—Chief Justice VANDERBILT and Justice ACKERSON—2.