IRENE ROMEO, PETITIONER-APPELLANT, v. IRENE ROMEO, T/A CLUB 37, RESPONDENT-RESPONDENT.

Argued April 21, 1980—Decided July 16, 1980.

Barry D. Maurer argued the cause for appellant (Maurer & Maurer, attorneys).

Patrick C. English argued the cause for respondent (Enright, Porter & Lenney, attorneys).

The opinion of the Court was delivered by

PASHMAN, J.

In this case a wife seeks dependency benefits under the Workers' Compensation Act, N.J.S.A. 34:15–1 et seq., by reason of the death of her husband in the course of his employment by the wife. We must consider whether the common law rule that contracts between spouses are unenforceable prevented the existence of a valid employment relationship—a prerequisite for recovery.

## I

### Facts

The essential facts are undisputed. Petitioner Irene Romeo and decedent Joseph Romeo were married in 1963 and lived together without separation until the husband's death. In June 1973 petitioner purchased the Club 37, a tavern and restaurant located in Newark, New Jersey. She owned the business as sole proprietor. The husband worked at the tavern on a part-time basis until September 1973, when he left other employment and began working for his wife full-time for a salary of $150 per week. His various duties included several trips each week to a nearby bank necessitated by the tavern's practice of cashing paychecks for local factory workers.

Sometime in the early afternoon on February 22, 1974, decedent went to the bank to deposit checks that the tavern had

cashed and to withdraw more cash. Petitioner testified that she observed her husband put the checks in his pocket and then gave him the keys to her car.[1] Her husband never returned to the tavern. Later that afternoon a Newark police officer found Joseph Romeo's body, with gunshot wounds in the back of the head, in the passenger seat of petitioner's car on the corner of Paris and Magazine Streets in Newark. The police officer found only a few dollars on the body. He testified that after investigation the police department concluded that the decedent had been ambushed as he returned from the bank to petitioner's car, driven to an isolated area and then robbed and shot.

On February 23, 1976, petitioner filed a petition under the Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128, for dependency benefits allegedly due her as a result of her husband's death. The New Jersey Department of Labor and Industry, Division of Workers' Compensation, held hearings on four days between March 1977 and February 1978. On May 5, 1978, the compensation judge ruled that petitioner was entitled to dependency benefits of $75 per week. See *N.J.S.A.* 34:15–12(b).[2]

The compensation judge found that decedent worked for petitioner and that his death was a result of an accident which arose out of and in the course of his employment. See *N.J.S.A.* 34:15–7. Addressing the effect of petitioner's status as her late husband's employer on her right to recover dependency benefits, the judge considered "whether interspousal immunity prohibits payment of compensation if the employee and employer are husband and wife." He recognized that this Court had already determined the issue in *Bendler v. Bendler*, 3 *N.J.* 161 (1949), which had denied compensation because of the incapacity of

---

[1] Records of the bank at which Club 37 maintained an account show that decedent made two trips to the bank on February 22, 1974. On the first trip checks in the amount of $4,923.34 were deposited and the same amount of cash withdrawn. On the second trip, at approximately 1:30 p. m., checks in the amount of $9,417.24 were deposited and an identical amount of cash withdrawn.

[2] The compensation schedule has since been amended. See *L.*1979, *c.* 283 (effective January 10, 1980).

spouses to contract between themselves. Nevertheless, the compensation judge felt "compelled to look beyond the specific pronouncement in the *Bendler* decision of 1949 to see whether there has been any change in the doctrine of interspousal immunity which is relevant to [that] issue * * *." Finding persuasive this Court's reasoning in later decisions abolishing interspousal tort immunity, the judge concluded that the common law rule should not be allowed to defeat the strong public policy behind the Workers' Compensation Act.

Respondent appealed and the Appellate Division reversed. The court concluded that the compensation judge had erred by framing the issue in terms of interspousal immunity. Viewing the question as one of contractual capacity, the Appellate Division considered itself bound by our decision in *Bendler*.[3] We granted certification, 82 *N.J.* 288 (1980), and now reverse.

## II

### *The Existing Lack of Capacity*

In *Bendler, supra,* this Court rejected a claim for compensation by a husband injured while working for his wife's embroidery business. Basing its determination on a three-part analysis, the Court concluded that the statutory right of recovery did not apply when employer and employee were married.

In the first part of its analysis, the Court reviewed the general scheme of the Compensation Act and concluded that

[t]he evident legislative design was the incorporation, in default of adverse action by the parties, of the compensatory system provided by Article II [elective compensation] into the common-law contract of hire * * *. [3 *N.J.* at 167]

Thus, a contract of hire, either express or implied in fact, was a "basic prerequisite" to the right of compensation. *Id.* The

---

[3]We note that the Appellate Division recognized the significance of this Court's decisions in the area of interspousal tort immunity, but declined to "predict [*Bendler's*] demise * * *." While acknowledging the obligation of a lower court "to anticipate the winds of change as well as probable future expression of a higher court," the court properly refused to deviate from the "clearly pronounced edict" of *Bendler*.

Court next observed that such a contractual relationship could not exist between a husband and a wife. *Id.* at 168. "[A] contract of hire between spouses is utterly void and unenforceable at law." *Id.* The Court noted two reasons for this common law rule:

> Contracts between husband and wife have been deemed objectionable, not only because they are inconsistent with the common-law doctrine of unity of person and interest, "but because they introduce the disturbing influence of bargain and sale into the marriage relation, and induce a separation rather than a unity of interests." [*Id.* at 172 (citation omitted)]

In the final part of its analysis, the *Bendler* Court assessed the effect of the Married Women's Act, *N.J.S.A.* 37:2–1 *et seq.*, on the common law contractual incapacity. While the provisions of the act granted married women numerous individual rights not enjoyed at common law, the Court reasoned the act

> [has] not so far severed the unity of person and interest of husband and wife in the law as that their contracts *inter se* are enforceable at law and are no longer the subject of jurisdiction in courts of equity alone. [3 *N.J.* at 168]

The Court also interpreted the disclaimer of *R.S.* 37:2–5 (now *N.J.S.A.* 37:2–5) [4] as "continu[ing] the common-law mutual disability of a husband and wife to contract *inter se* and to sue each other." 3 *N.J.* at 172. Thus, the Court determined that the legislation as well as the common law had declared contracts between spouses to be void at law.

Petitioner does not challenge the conclusion of *Bendler* that a contractual employment relationship is a prerequisite for recovery under the Compensation Act. See generally *Biger v. Erwin*, 57 *N.J.* 95 (1970), aff'g 108 *N.J.Super.* 293 (Cty.Ct.1970); *Smith v. E.T.L. Enterprises*, 155 *N.J.Super.* 343 (App.Div.1978); *N.J.S.A.* 34:15–9, –36. The dispute here focuses on those portions of the opinion discussing the incapacity of spouses to contract with each other. Petitioner contends that later decisions of this Court abolishing interspousal tort immunity have undermined the bases of *Bendler.* Respondent answers that the rule in *Bendler*

---

[4]That provision states that

> Nothing in this chapter contained shall enable a husband or wife to contract with or to sue each other, except as heretofore, and except as authorized by this chapter [*N.J.S.A.* 37:2–1 *et seq.*].

has not been legislatively altered in the 30 years since it was decided. According to respondent, this signifies legislative adoption of *Bendler*; therefore, any modification must come from the Legislature and not this Court.

## III

### *Reassessment of the Lack of Capacity*

We agree that the rule of *Bendler* should be reconsidered in the light of recent judicial developments. Since it involved a construction of *N.J.S.A.* 37:2–5 and an interpretation of the common law, we address each ground in turn.

### A

### *The Statutory Basis*

■ Before reexamining the statutory basis for a lack of contractual capacity, we must consider whether *Bendler*'s construction of *N.J.S.A.* 37:2–5 has received legislative endorsement, for such approval would foreclose our review. We recognize that legislative silence has been held to indicate acquiescence in a judicial construction. See, *e. g., Lemke v. Bailey*, 41 *N.J.* 295, 301 (1963). Such inaction, however, may also "mean nothing more than that the Legislature did not act." *White v. Township of North Bergen*, 77 *N.J.* 538, 556 (1978); see 2A Sands, Sutherland *Statutory Construction,* § 49.10 at 261 (4th ed. 1973). We have held the better view to be that "[t]he intent expressed in [a statute] is a judicial question with respect to which the inaction of subsequent legislatures is not dispositive." *State v. Sands*, 76 *N.J.* 127, 137–138 n. 1 (1978). See *Schmoll v. Creecy*, 54 *N.J.* 194, 203 (1969).

■ We now consider the construction of *N.J.S.A.* 37:2–5 in *Bendler* to be in error. This conclusion emerges from both a proper assessment of the provision itself and recent decisions of this Court rejecting the interpretive approach of *Bendler. N.J. S.A.* 37:2–5 provides:

> Nothing in this chapter contained shall enable a husband or wife to contract with or to sue each other, except as heretofore, and except as authorized by this chapter.

On its face, the statute purports simply to dispel any notion that legislation has altered the rights of husbands and wives to contract with and sue each other beyond the specific terms of the chapter enacted, *N.J.S.A.* 37:2–1 *et seq.* The words "except as heretofore" indicate an intent to leave existing common law rules undisturbed rather than to incorporate each rule into the legislation itself. This is the interpretation reflected in the early decisions. See *Hudson v. Gas Consumers' Ass'n*, 123 *N.J.L.* 252, 253 (E & A 1939); *Freitag v. Bersano*, 123 *N.J.Eq.* 515, 516–517 (Ch.1938); *Drum v. Drum*, 69 *N.J.L.* 557, 558 (Sup.Ct. 1903).

This view accords with the setting in which the provision was enacted. It was passed in 1874 as part of "An Act to Amend the Law Relating to the Property of Married Women," *Rev.Stat.* 1874,[5] p. 468 (approved March 27, 1874) ("Married Women's Act"). That act consolidated several prior statutes on the same subject. See *L.*1852, *c.* 171 (p. 407); *L.*1857, *c.* 189 (p. 485); *L.*1864, *c.* 396 (p. 698); *L.*1868, *c.* 337 (p. 782); *L.*1873, *c.* 444 (p. 108). It also provided for the first time that the wages and earnings of a married woman acquired in any employment "which she carries on separately from her husband" were her sole and separate property. This abrogated the common law rule that a husband was entitled to his wife's earnings. See *Turner v. Davenport*, 63 *N.J.Eq.* 288 (E & A 1901). The act further provided that a married woman could sue and be sued in her own name, without joining her husband, thereby repealing *L.*1862, *c.* 146 (p. 271), and *L.*1867, *c.* 444 (p. 959), which had required joinder. A married woman was also given the right to contract in her own name apart from her husband. The Married

---

[5]The Revised Statutes of 1874 were actually a part of what became known as the Revised Statutes of 1877. See *L.*1875, *c.* 32 (p. 14) (providing for the printing of 1000 copies of the portion of the statutory revision completed and adopted by the Legislature in 1874). See *L.*1871, *c.* 431 (p. 88) ("An act to provide for the revision and consolidation of the public statutes of this State" approved April 14, 1871).

Women's Act thus accomplished sweeping reforms on behalf of married women. See *Wilson v. Herbert*, 41 *N.J.L.* 454 (Sup.Ct. 1879). It is therefore not surprising that the Legislature included limiting language, now *N.J.S.A.* 37:2–5, to ensure that the act would not be construed to override prior law in the absence of an express provision.[6]

The *Bendler* Court's construction of *N.J.S.A.* 37:2–5 as a legislative incorporation of the common law was followed in *Koplik v. C. P. Trucking Corp.*, 27 *N.J.* 1 (1958), which involved interspousal immunity from suit. However, later decisions of this Court rejected that interpretation. The trend away from incorporation began in *Long v. Landy*, 35 *N.J.* 44 (1961), which permitted suit to be brought by a wife against her husband's estate for injuries she sustained as a passenger in her husband's automobile. The Court concluded that *R.S.* 37:2–5 "serve[d] solely to incapacitate or disable a wife from suing her tortfeasor mate during the existence of the reasons which underlie the common law doctrine [of interspousal immunity]." 35 *N.J.* at 50. Finding those reasons to be absent when one spouse was deceased, the Court permitted suit.

In *Immer v. Risko*, 56 *N.J.* 482 (1970), this Court explained the full import of the approach taken in *Landy*:

> We would, of course, not have the option of examining the reasons behind the rule or even whether the reasons should apply to a particular case if the immunity were mandated by statute. * * * In other words, the statute did not incorporate immunity but rather the common law with its inherent capacity for change. [*Id.* at 487]

---

[6]The full text of the original clause provided:

14. That nothing in this act contained shall enable any married woman to execute any conveyance of her real estate, or any instrument incumbering the same, without her husband joining therein as heretofore, except in those instances for which express provision is herein made; nor shall any conveyance, deed, contract, or act of such married woman, nor shall any judgment or decree against her, in any respect impair or affect the right of the husband in her lands as tenant by the curtesy, after her death; nor shall anything herein enable husband or wife to contract with, or to sue each other, except as heretofore. [*Rev.Stat.*1874, p. 468, sec. 14]

This view of the relationship between *N.J.S.A.* 37:2–5 and the common law was recently reaffirmed in *Merenoff v. Merenoff*, 76 *N.J.* 535 (1978). Justice Handler there observed that the statute "touched only obliquely the common law or nonstatutory capacity of spouses to sue each other. \* \* \* [It] did not constitute a statutory ratification or perpetuation of the substantive, common law immunity doctrine." *Id.* at 548.

This interpretation of the statute—that it did not incorporate fixed doctrine formerly a part of the common law—comports with both the language and the context of the provision. Although we have not yet rejected the "incorporation" theory in a case involving contractual capacity, we can conceive of no reason for imputing to the Legislature two inconsistent intentions embodied in statutory language simply because it addresses two areas of law. We conclude that *N.J.S.A.* 37:2–5 does not establish a substantive rule of law on the capacity of spouses to contract with one another. Our analysis must therefore focus on the common law rule.

### B

### *The Basis at Common Law*

In re-assessing the soundness of a common law rule, our task is "to determine whether there [exist] any reasons which still justly undergird the doctrine \* \* \*." *Merenoff, supra,* 76 *N.J.* at 549; see *Immer, supra,* 56 *N.J.* at 488. As Chief Justice Vanderbilt explained in *State v. Culver,* 23 *N.J.* 495 (1957), *cert.* den., 354 *U.S.* 925, 77 *S.Ct.* 1387, 1 *L.Ed.*2d 1441 (1957), and *cert.* den. *sub nom. Culver v. Goodman,* 359 *U.S.* 975, 79 *S.Ct.* 884, 3 *L.Ed.*2d 842 (1959):

> The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. [*Id.* at 505]

We thus turn to re-examine the reasons behind the common law rule against interspousal contracts: the theory of spousal unity of person and interest, and the preservation of marital harmony. See *Bendler, supra,* 3 *N.J.* at 172.

Little need be said with regard to the former. This Court has previously recognized the "artificial and technical" nature of the doctrine, see *Long v. Landy, supra*, 35 *N.J.* at 50, and concluded that "this metaphysical concept cannot be seriously defended today." *Immer, supra*, 56 *N.J.* at 488. The complete erosion of this theory is evidenced in judicial decisions, see, *e. g., Merenoff, supra* (abolishing interspousal immunity in personal injury actions); *In re Gaulkin*, 69 *N.J.* 185 (1976) (wife of judge may engage in political activity); see also *Trammel v. United States*, 445 *U.S.* 40, 100 *S.Ct.* 906, 63 *L.Ed.*2d 186 (1980) (defendant in criminal proceeding has no right to prevent spouse from testifying), and statutory law, see, *e. g., N.J.S.A.* 37:2–10 (married woman liable for debts contracted in own name); *N.J.S.A.* 37:2–12 (married woman has right to own property independently); *N.J.S.A.* 37:2–6 (married woman may sue or be sued without joining husband); *N.J.S.A.* 37:2–16.1 (married woman may contract with husband alone or with third parties to form a partnership). The realities of the marketplace also belie the notion that spouses are specialized members of a single, indivisible enterprise. *Jersey Shore Medical Center-Fitkin Hospital v. Baum*, 84 *N.J.* 137, 146–149 (1980); *Lepis v. Lepis*, 83 *N.J.* 139 (1980); see U. S. Dep't of Labor, Bureau of Labor Statistics, *Marital and Family Characteristics of Workers, 1970 to 1978* (Special Labor Force Report #219) 50 at Table 1 (in 1977, both spouses were wage earners in 48.8% of two-spouse families); see also *Orr v. Orr*, 440 *U.S.* 268, 99 *S.Ct.* 1102, 59 *L.Ed.*2d 306 (1979). It is therefore no longer open to question that the marital couple is "an association of two individuals" rather than "an independent entity." *Eisenstadt v. Baird*, 405 *U.S.* 438, 453, 92 *S.Ct.* 1029, 1038, 31 *L.Ed.*2d 349, 362 (1972); see *In re Gaulkin, supra*, 69 *N.J.* at 194; *Bendler, supra*, 3 *N.J.* at 173 (Ackerson, J., dissenting).

We next consider the notion that marital discord will be fostered by allowing spouses to contract with each other. We have rejected this contention in abrogating interspousal tort immunity. In *Immer v. Risko, supra*, we expressed doubt that marriages would be more disturbed by allowing tort suits be-

tween spouses: "A person would not sue his spouse if there were perfect harmony, and it is unlikely that adjudication of the rights will worsen the relationship." 56 *N.J.* at 488.[7] The availability of insurance coverage for tort liability also undermined domestic harmony as a justification for immunity. *Merenoff, supra,* 76 *N.J.* at 550–551; *Immer, supra,* 56 *N.J.* at 489. Most significant, however, were Justice Handler's observations on the role of the courts in attempting to preserve marital harmony:

> There is, in addition to all else, a certain mischief in the unspoken assumption at the heart of the domestic harmony rationale for the immunity doctrine, namely, that in this context courts are somehow fit to monitor marital morality. Courts can claim no penetrating insight by which to fathom the impact of an interspousal law suit or gauge its effect upon the strength or fragility of a marriage. The threat to domestic harmony posed by a legal action between spouses is an imponderable; the cohesiveness of a marriage may be jeopardized as much by barring a cause of action as by allowing it. [*Merenoff, supra,* 76 *N.J.* at 551]

However, the weaknesses of relying on marital harmony to justify tort immunity do not necessarily carry over to contract claims. The observation in *Immer* that "[a] person would not sue his spouse if there were perfect harmony" has no counterpart regarding the execution of a contract. It is one thing to permit judicial aid to a tortiously injured plaintiff by abandoning the guise of promoting marital harmony; it is quite another to say that in permitting parties to seek their own personal happiness, see *Merenoff, supra,* 76 *N.J.* at 552, the power of a court of law should be available to enforce a specific arrangement. Although not an "independent entity," a marriage is still a partnership that is more than the sum of its members. For that reason the State has an interest in treating contractual agreements within a marriage more flexibly than agreements between persons who are not married to each other. *Cf. Carlsen v. Carlsen,* 72 *N.J.* 363, 370 (1977) (interspousal contract enforceable in equity to the extent "fair and equitable"); *Koplik, supra,*

---

[7] We have reached a similar conclusion when examining intrafamilial tort actions. See *Small v. Rockfeld,* 66 *N.J.* 231 (1974); *France v. A. P. A. Transport Corp.,* 56 *N.J.* 500 (1970).

27 *N.J.* at 16 (property and contract actions between spouses may be brought in equity).

In spite of the genuine interests served by the common law rule against enforcement of interspousal contracts, it could become an instrument of injustice were we to accept uncritically the assumption that any enforcement would promote discord. Thus, in assessing the continued vitality of the common law rule we must apply the asserted justification of marital harmony to the particular type of contractual relationship for which recognition is sought.

Here petitioner seeks recognition of an employment relationship. *Bendler, supra,* refused recognition on the ground that it would "introduce the disturbing influence of bargain and sale into the marriage relation  *  *  *." 3 *N.J.* at 172. This conclusion has been criticized as an anachronistic holdover from "a time when the only services that could be affected by such a rule were domestic services which the spouse was bound in any case to perform by the obligations of the marriage relation." 1C A. Larson, *Workmen's Compensation Law* § 47.20 at 8–238 (1980 Rev.).[8] We consider the common law rule to have a broader basis than an obsolete "model of domestic relations." *Lepis, supra,* 83 *N.J.* at 156. However, there are several reasons why the State's interest in protecting marital harmony does not support a denial of workers' compensation coverage.

First is the observation that the terms of workers' compensation coverage cannot be negotiated by the parties. The scheme is provided entirely by statute and is not subject to "bargain and sale" or modification. The financial security provided by the prompt and certain recovery inherent in workers' compensation would probably enhance marital harmony rather than detract from it. Further, since the employer is required to insure its employees, both the suit and any recovery would effectively be against an insurance company rather than the spouse. See *Immer, supra,* 56 *N.J.* at 489. As we observed in *Merenoff,*

---

[8]The case before us does not involve such services. Our holding today is addressed to interspousal contracts of a commercial nature.

"[t]he danger of marital disruption becomes almost academic where liability insurance is available." 76 *N.J.* at 551. The same is true regarding the workers' compensation insurance required to be carried by employers. See *N.J.S.A.* 34:15–71.

These factors distinguish the present case from one in which remedies are sought for the breach of an interspousal employment contract. Since the latter action would involve elements of domestic relations as well as contract law, it might be better left to the flexible powers of a court of equity. See *Merenoff, supra,* 76 *N.J.* at 555. We are not here required to resolve that issue, however. The question before us is whether the common law rule against interspousal contracts, despite its demonstrated weaknesses in the workers' compensation setting, will be allowed to stand as a bar to recovery under the ˌWorkers' Compensation Act. We believe that to do so would permit the rule to become an instrument of injustice.

"[I]t is to be borne in mind that the act we are considering is one of social insurance * * *," *Young v. Sterling Leather Works,* 91 *N.J.L.* 289, 295 (E & A 1917), "designed to place the cost of work-connected injury on the employer who may readily provide for it as an operating expense." *Hornyak v. The Great Atlantic & Pacific Tea Co.,* 63 *N.J.* 99, 100 (1973); see ˈRenshaw v. U. S. Pipe & Foundry Co.,* 30 *N.J.* 458, 465 (1959); *Tocci v. Tessler & Weiss, Inc.,* 28 *N.J.* 582, 586 (1959); *Morris v. Hermann Forwarding Co.,* 18 *N.J.* 195, 197–198 (1955); *Nagy v. Ford Motor Co.,* 6 *N.J.* 341, 350 (1951). The fundamental principle underlying workers' compensation is that of compensating an injured employee. The statutory scheme was designed "[t]o overcome the harsh common law rules which often resulted in a denial of recovery to injured workmen or their dependents where death or injuries occurred from the work-connected accidents * * *." *Stellmah v. Hunterdon Coop. G. L. F. Serv., Inc.,* 47 *N.J.* 163, 169 (1966).

The strength of this public policy lies not only in the imposition of liability on the employer without regard to fault, *N.J. S.A.* 34:15–7, but also in the operation of the elective compensation provisions. The compensation scheme

enters by operation of law into every contract of hiring made in this State unless there be an affirmative rejection of the plan for the alternative common-law liability for negligence as modified by the provisions of article I [*N.J.S.A.* 34:15–1 to –6] of the act. [*New Amsterdam Casualty Co. v. Popovich,* 18 *N.J.* 218, 226 (1955)]

See *Cureton v. Joma Plumbing & Heating Co.,* 38 *N.J.* 326, 331 (1962); *Estelle v. Board of Educ.,* 14 *N.J.* 256, 259–260 (1954); *Gotkin v. Weinberg,* 2 *N.J.* 305, 308 (1949). Any attempt to reject the elective compensation provisions is strictly construed against the employer. See *Naseef v. Cord, Inc.,* 48 *N.J.* 317 (1966).

Respondent argues that this compensation policy is outweighed by the increased risk of fraud and collusion presented by recognizing interspousal employment contracts. This Court has consistently rejected the argument that an entire class of potentially well-founded claims should be denied because of such a possibility. See *Merenoff, supra,* 76 *N.J.* at 553; *Immer, supra,* 56 *N.J.* at 493–495; *France v. A. P. A. Transport Corp., supra,* 56 *N.J.* at 505; *Cohen v. Kaminetsky,* 36 *N.J.* 276, 283 (1961). We entertain no doubt that a compensation judge has ample means—and the expertise—to weed out fraudulent claims of employment relationships. We are equally confident that the employer's insurer will not hesitate to bring to light any such scheming on the part of its insured. See *Merenoff, supra,* 76 *N.J.* at 554.

We therefore conclude that our strong State policy to provide social insurance for work-related injuries should not be thwarted by continued application of the common law rule against interspousal contracts.[9] The unjust effects of the rule in the present case are highlighted by the fact that spouses of majority shareholders in close corporations, see *Howard v. Harwood's Rest. Co.,* 25 *N.J.* 72 (1957), and spouses of members of partnerships, see

---

[9]Other states have dealt explicitly with this question in their compensation acts. Compare, *e. g., Idaho Code Ann.* § 72–212(4) (Supp.1980) (excluding from coverage members of employer's family "dwelling in his household" unless coverage thereof is elected), with *Mich.Stat.Ann.* § 17.237(161)(1)(b) (Supp.1980) [M.C.L.A. § 418.161] (including husbands and wives employed full-time by a spouse at a specified rate of pay).

*Felice v. Felice,* 34 *N.J.Super.* 388 (App.Div.1955), are entitled to coverage under the act. Thus, the only area where the common law's incapacity presently operates to deprive a spouse and dependents of benefits, see *N.J.S.A.* 34:15–13, is where the employer is a sole proprietorship. Our reassessment of the rationales for the rule against interspousal contracts convinces us that we should not continue to apply the rule so as to deprive spouses who wish to employ each other of the benefits of workers' compensation coverage.

## Conclusion

For the foregoing reasons, the judgment of the Appellate Division is reversed and the compensation award reinstated.

*For reversal*—Chief Justice WILENTZ and Justices SULLI-VAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.